Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 875 | **DATE** | June 21, 2004 |
| **CASE TITLE** | *United States v. Federico Tejeda-Baltazar* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court GRANTS Defendant Tejeda-Baltazar's Motion for Downward Departure.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JUN 23 2004 date docketed | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **Hon. Blanche M. Manning** |
| | ) | |
| v. | ) | **03 CR 875** |
| | ) | |
| FEDERICO TEJEDA-BALTAZAR, | ) | |



### MEMORANDUM AND ORDER

Defendant Tejeda pled guilty to one count of illegal re-entry into the United States, after

having been deported because of a conviction of an aggravated felony, in violation of 8 U.S.C. §

1326. Under United States Sentencing Guideline ("Guideline") section 2L1.2, Probation

calculated Tejeda's total offense level at a 21, with a criminal history category of II, which results

in a range of incarceration between 41 to 51 months. The present matter comes before this Court

on Tejeda's Motion for Downward Departure based on his "exceptional cultural assimilation" to

the United States, pursuant to Guideline section 5K2.0 and 18 U.S.C. § 3553. For the reasons

that follow, this Court GRANTS the motion.[1]

Generally, the sentencing court must impose a sentence falling within the applicable

range set forth in the Guidelines. See Koon v. United States, 518 U.S. 81, 85 (1996). The court

may, however, depart from the Guidelines if it "finds that there exists an aggravating or

mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

Sentencing Commission in formulating the guidelines that should result in a sentence different

from that described." 18 U.S.C. § 3553(b). See also U.S.S.G. § 5K2.0; Koon, 518 U.S. at 92.

---

[1]     This Memorandum and Order vacates the Court's oral ruling at Tejeda's sentencing
hearing denying his motion for downward departure.

Therefore, "[i]n the absence of a characteristic or circumstance that distinguishes a case as sufficiently atypical to warrant a sentence different from that called for under the guidelines, a sentence outside the guideline range is not authorized." U.S.S.G. § 5K2.0, Comment.

Examining departures from the Guidelines, the Supreme Court in Koon explained that the Sentencing Commission intended "the sentencing courts to treat each guideline as carving out a 'heartland', a set of typical cases embodying the conduct that each guideline describes." Koon, 518 U.S. at 93 (quoting U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b)). The Sentencing Commission, however, "did not adequately take into account cases that are, for one reason or another, unusual." Id. Thus, "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b). Therefore, before a sentencing court is permitted to depart from the Guidelines, the court must find that the case is "unusual" enough for it to fall outside the "heartland" of cases covered in the applicable guideline. See Koon, 518 U.S. at 93.

The Court in Koon set forth the following factors that sentencing courts should use in determining whether to depart from the applicable Guideline range is appropriate:

> 1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
> 2) Has the Commission forbidden departures based on those features?
> 3) If not, has the Commission encouraged departures based on those features?
> 4) If not, has the Commission discouraged departures based on those features?

Koon, 518 U.S. at 95. The Court went on to explain the mechanics of applying this framework:

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor

already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. <u>If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guidelines heartland.</u> The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent.

<u>Id.</u> at 95-96 (emphasis added).

Here, the "cultural assimilation" factor is not mentioned in the Guidelines. Therefore, the Court will examine the relevant case law and the Guidelines to determine whether it is a factor which is sufficient to take this case out of the heartland.

While the Seventh Circuit has not specifically addressed whether the sentencing court may "consider 'cultural assimilation'" when sentencing a defendant for illegally reentering the United States, in violation of 18 U.S.C. § 1326, <u>United States v. Soto-Montero</u>, 55 Fed. Appx. 778, 779, 2003 WL 261958, at *2 (7th Cir. Feb. 5, 2003), the three circuits to address the issue have held that "cultural assimilation" could be taken into account when examining the defendant's culpability – <u>e.g.</u>, whether the defendant illegally returned only because of his strong ties to the United States and not for economic or criminal reasons. <u>E.g.</u>, <u>United States v. Rodriguez-Montelongo</u>, 263 F.3d 429, 433 (5th Cir. 2001); <u>United States v. Sanchez-Valencia</u>, 148 F.3d 1273, 1274 (11th Cir. 1998); <u>United States v. Lipman</u>, 133 F.3d 726, 730-31 (9th Cir. 1998). Following these decisions, a number of district courts, including one in the Seventh Circuit, have granted downward departures for illegal reentry based on a lesser degree of culpability due to cultural assimilation. <u>E.g.</u>, <u>United States v. Martinez-Alvarez</u>, 256 F. Supp. 2d 917, 918-20 (E.D. Wis. 2003); <u>United States v. Reyes- Campos</u>, 293 F. Supp. 2d 1252, 1255-57 (M.D. Al. 2003).

In <u>United States v. Bautista</u>, 258 F.3d 602, 605 n.2 (7th Cir. 2001), the court noted that a departure based on the consequences of deportation because of "cultural assimilation" was prohibited. As an aside, however, the court appeared to leave open whether a defendant could argue that "cultural assimilation" could be taken into account when examining the defendant's culpability – e.g., whether the defendant illegally returned only because of his strong ties to the United States. See <u>Soto-Montero</u>, 55 Fed. Appx. 778, 779, 2003 WL 261958, at *2 (declining to determine whether <u>Bautista</u> "opened the door" to argue "cultural assimilation" with respect to culpability).

Affirming the district court's denial of departure, the court in <u>Soto-Montero</u> held, assuming that departure was permitted, that the court properly exercised its discretion. 55 Fed. Appx. 778, 780, 2003 WL 261958, at *3. The district court first examined the "cultural assimilation" factors which included the fact that the defendant "lived in the United States for most of his life" with his family, could not speak his native language (Spanish), had no real connection to Mexico. <u>Id.</u> The court weighed these factors against the defendant's "frequent run-ins with the law, which undermined his stated sharing of community values and national allegiance." <u>Id.</u> As a result, the Court concluded that the defendant's "cultural assimilation" to the United States did not outweigh his checkered criminal history, and therefore, the defendant was not entitled to a downward departure. <u>Id.</u>

Applying these same factors, the sentencing court in <u>Martinez-Alvarez</u>, 256 F. Supp. 2d at 920-21, granted a one-level departure based on the finding that the defendant's "motivation" to illegally reenter the United States was based on his "cultural assimilation," and therefore, the case was "sufficiently unusual" to take the "case out of the heartland of typical re-entry cases."

4

In making this determination, the court considered four "objective factors." First, the court examined the length of time the defendant lived in the United States, noting that "a person who has lived here most of his life [particularly if he was brought here as a child by his parents] is more likely to have been assimilated," and thus, motivated to illegally re-enter the country. Id. at 920. Also relevant to this factor is whether the defendant "was educated in American schools" and whether he "was a "lawful permanent resident," both of which "would advance assimilation." Id.

In contrast to the first factor, the court next examined the defendant's level of familiarity with his country of origin" because "a defendant deported to a country he does not know will have greater motivation to leave than one deported to a more familiar environment." Id. Relevant to this determination is whether the defendant has spent "any appreciable" time there, "particularly as an adult," and whether the defendant speaks his native language. Id.

Third, the court looked into whether the defendant had strong "family ties" in the United States because the desire to be with family "can be a strong motivation to re-enter unlawfully." Id. Important to this inquiry is whether "all or most of [defendant's] family live [in the United States]," particularly a spouse or minor children, and whether the children are legal United States citizens. Id.

Finally, the court took into account "what the defendant did and where he went upon re-entry." Id. Noting that a defendant who "immediately returned to his family" shows a greater likelihood of cultural assimilation. Id.

Applying the above factors, the court found that all four "weigh in favor of departure." Id. at 921. The defendant's mother brought him to the United States as a small child

and he had lived here ever since, attending school and eventually becoming a permanent resident. Id. Because he had "lived virtually his entire life" in the United States, the court found that the defendant had "no experience living in Mexico." Id. Other than his estranged father, the defendant's entire family resided in the Midwest, including his five year old daughter, whom he actively supports both emotionally and momentarily. Id. Within a month of being deported, the defendant illegally returned to the Midwest to be with his family and began working to support his family. Id. Finally, the court noted that defendant was arrested after a traffic stop.

Taking the above facts into account, the court found that "this case is sufficiently unusual to merit a small departure" because defendant's "motivation" to illegally reenter the United States was based on his "cultural assimilation," not on any economic or criminal motive. Id. In making this determination, the court noted that "most unlawful re-entry defendants . . . lack defendant's ties to this country." Id. Also important to the court was the fact that most other illegal re-entry defendants are arrested after committing other serious crimes, where as the defendant there was arrested after a simple traffic stop.[2] Id.

Consequently, although it is not certain what position the Seventh Circuit will take on the issue, based on the cases cited above, particularly Soto-Montero, 55 Fed. Appx. 778, 779, 2003 WL 261958, at *2, it appears that this Court has the discretion to weigh the facts of this case to determine if "cultural assimilation" had an effect on Tejeda's culpability in illegally reentering the United States. Because this Court finds that it has the discretion to weigh cultural assimilation, it will now turn to the factors identified in Soto-Montero, 55 Fed. Appx. 778, 779,

---

[2]    In reaching this conclusion, the court noted that these positive factors outweighed the factors which go against cultural assimilation, such as the defendant dropping out of school, his gang affiliation, multiple arrests, and drug abuse. Id. at 922.

2003 WL 261958, at *2 and <u>Martinez-Alvarez</u>, 256 F. Supp. 2d at 920-21.

After carefully reviewing the parties' submission, the Pre-Sentence Investigation Report, and letters from Tejeda's close friends and family, this Court finds that it is proper to depart downward based on "cultural assimilation." Tejeda's parents brought him to Chicago from Mexico at the age of nine and he and his family, mother and sisters, have lived here since that time. He eventually became a permanent legal resident. During the 11 years before he was arrested for possession and sale of narcotics, Tejeda appears to have been a hard working person. After dropping out of high school, he obtained steady employment and worked to support his family. Despite growing up in a neighborhood infested with gangs and drugs, other than the conviction for which he was deported, Tejeda had no other serious convictions. He was arrested for the current charge only after being misidentified as being involved in a crime.

The record currently before this Court shows that all of Tejeda's friends and family, including his only child and fiance of two years, live in the United States. Tejeda is apparently very close to his only child, and although no longer with the mother, has been providing financial support. As a result of living almost his entire life in the United State, once deported to Mexico, Tejeda had great difficulty finding work and felt socially isolated in a country he had not lived in since he was a boy. Thus, shortly after his deportation, Tejeda illegally re-entered the United States and made his way back to Chicago to be with his family and friends. Tejeda's sister told Probation that the family cared so much for him that they were willing to go back to Mexico, so that he will not be alone.

Based on the above facts, this Court finds that Tejeda illegally re-entered the United States based on his exceptional "cultural assimilation," and is not as culpable as the usual

7

defendant charged with illegal re-entry, who does not have such strong ties, and re-enters for economic or criminal purposes. As such, this Court holds that the facts of this case are sufficiently unusual to take this case out of the heartland of a typical re-entry case.

Having decided to grant a downward departure, the Court next turns to how much to depart. To determine the extent of departure, sentencing courts must "link the degree of departure to the structure of the Guidelines and justify the extent of the departure taken." United States v. Scott, 145 F.3d 878, 886 (7th Cir. 1998). One method approved for justifying the extent of departure is for the court to analogize the departure to an existing Guideline. See Martinez-Alvarez, 256 F. Supp. 2d at 922. The court in Martinez-Alvarez, 256 F. Supp. 2d at 922, found that a departure for "cultural assimilation" is closely analogous to a departure under section 2L2.1(b)(1), which provides for a three level departure for a defendant convicted of human smuggling, if the person being smuggled was the defendant's spouse or child. Id. This Court finds this analogy reasonable and therefore will depart 3 levels downward.

Accordingly, this Court finds that Tejeda now has an offense level of 18 and a criminal history category of II, which results in a range of incarceration between 30-37 months. Based on the evidence currently before it, this Court sentences Tejeda to 30 months incarceration.

## CONCLUSION

For the foregoing reasons, this Court GRANTS Defendant Tejeda's motion for downward

departure and imposes a sentence of 30 months incarceration.   It is so ordered.

ENTER:

BLANCHE M. MANNING
U.S. DISTRICT COURT JUDGE

DATE:___10/21/04___